**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA *ex rel.* Jeffrey W. WHITE,

*Plaintiffs*,

*v.*

FWG SOLUTIONS, INC, and Nshokano KATABANA,

*Defendants*.

**FILED UNDER SEAL**

Case No. ___________

***QUI TAM* COMPLAINT**

Case: 1:22–cv–02040 JURY DEMAND
Assigned To : Cobb, Jia M.
Assign. Date : 7/6/2022
Description: Gen. Civ. (E–DECK)

**JURY TRIAL DEMANDED**

Plaintiff-Relator Jeffrey W. WHITE ("Relator"), acting on his own behalf and on behalf of the United States pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b), and Plaintiff the UNITED STATES OF AMERICA, for their Complaint against FWG Solutions, Inc. ("FWG" or "the Company") and its owner and CEO, Nshokano Katabana ("Katabana") (together with the Company, "Defendants"), hereby allege and aver as follows:

## PRELIMINARY STATEMENT

1. This is an FCA action to recover treble damages and civil penalties against Defendants, who, in 2020 and 2021, defrauded the Small Business Administration ("SBA") in connection with FWG's applications for and receipt of over a million dollars in Covid-19 pandemic-related Paycheck Protection Program ("PPP") funding, and who, since at least 2021, fraudulently obtained millions of dollars in federal government contracting benefits through the SBA's Section 8(a) Business Development program.

2. FWG is a federal defense and technology contractor based in the Nation's capital. Because of the nature of its business, it was not negatively impacted by the Covid-

19 pandemic and did not require payroll support or other economic assistance from the federal government. To the contrary, its business continued to thrive, and grow substantially, during the pandemic period.

3. When FWG applied for and received a PPP First Draw Loan in April 2020, and again when it applied for and received a PPP Second Draw Loan in January 2021, Defendants lied on the loan applications. In each instance, they falsely certified that FWG was eligible for PPP funding even though the Company was not experiencing the economic uncertainty, personnel layoffs, or financial decline due to the Covid-19 pandemic required for such funding, and even though it needed no financial assistance during the pandemic. They also falsely certified how the funds were going to be used and how funds previously received from the government had been spent, claiming that the money was for payroll support when it was not.

4. Subsequently, in August and November 2021, respectively, FWG fraudulently obtained forgiveness of the PPP First and Second Draw Loans from the SBA, essentially converting them into government grants. To do so, Defendants lied on the forgiveness applications about what the money had been used for and why it had been needed in the first place. They falsely certified on those applications that the Company met the requirements for forgiveness, when it clearly did not.

5. Instead of using the PPP federal grant funds for the purposes Congress intended – to wit, to provide "paycheck protection" aimed at assisting employees of small businesses in moderating the devastating economic impact of the Covid-19 pandemic – Katabana used the money (along with the increased profits stemming from FWG's thriving business during the pandemic) to line his own pockets and those of his family members, including through the purchase of a fancy home and two luxury sports cars.

6. These increases in Katabana's net worth during the pandemic, as well as his augmented compensation as CEO, caused him to no longer qualify (as of 2021) as an economically-disadvantaged small business owner for purposes of FWG's participation in SBA's 8(a) Business Development program, which provides eligible participants with valuable set-asides and federal contracting preferences, among other assistance, "designed to strengthen their ability to compete effectively in the American economy."

7. Although FWG ceased to be eligible to participate in the 8(a) Business Development program in 2021, it falsely certified to the SBA in 2021 and 2022 that Katabana did not exceed the program's salary and net worth limits. As a result of these false certifications, FWG was improperly awarded at least 10 lucrative government contracts worth over $17 million, either in the form of sole-source awards (*i.e.*, contracts with no competing bidders) or set-aside award contracts (*i.e.*, with limited competitive bidders bidding on the contract). FWG also received other valuable assistance and benefits through the 8(a) Business Development program.

8. Plaintiffs now seek to hold Defendants accountable for their conduct, mitigate the fiscal impact of the fraudulent schemes and false certifications, and reimburse the government for Defendants' fraudulent diversion of taxpayer funds.

## PARTIES

9. Relator Jeffrey W. WHITE is a citizen of the United States and a resident of the District of Columbia. He is the former Chief Operating Officer of Defendant FWG. Pursuant to 31 U.S.C. § 3730(b)(1), he brings this action both on his own behalf and on behalf of the United States of America.

10. Defendant FWG is a corporation organized and incorporated under the laws of the District of Columbia, with a principal place of business located at 1101 Pennsylvania

Avenue, N.W., Suite 300, Washington, D.C. 20004. Prior to that, FWG had a principal place of business located at 1725 I Street, N.W., Suite 520, Washington, DC 20006. FWG conducts business throughout Washington, D.C. and nationally, to include prominent geographic presence in Texas and Florida.

11. Defendant Katabana is a citizen of the United States and resident of Potomac, Maryland. Katabana is the CEO and owner of Defendant FWG, and conducts business throughout Washington, D.C. and nationally, to include prominent geographic presence in Texas and Florida.

## JURISDICTION AND VENUE

12. This is a civil action to redress violations of the FCA, 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730; (ii) pursuant to 28 U.S.C. § 1331, which confers federal question jurisdiction; and (iii) pursuant to 28 U.S.C. § 1345, because the United States is a plaintiff.

13. This court has personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because Defendants have at least minimum contacts with the United States. In addition, acts proscribed by 31 U.S.C. § 3729 have occurred in the United States. Moreover, Defendants can be found in, reside, or transact or have transacted business in the District of Columbia.

14. Venue is proper in the District of Columbia pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants conduct business in this District and because one or more acts proscribed by 31 U.S.C. §§ 3729 *et seq*. occurred in this District.

15. At or prior to the time Relator filed this Complaint, Relator provided to the Attorney General of the United States and to the United States Attorney for the District of Columbia a statement summarizing known material evidence and information related to the Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2). The disclosure statement was and is supported by material evidence. Relator is the original source of such evidence and information, none of which has previously been disclosed publicly prior to the filing of this Complaint.

## BACKGROUND

### I. THE FALSE CLAIMS ACT

16. The FCA has been the Government's primary fraud fighting tool since the Civil War era and provides the government with its primary means of recovery for frauds against the public fisc. *Qui tam* provisions encourage private citizens with information about fraud (known as "relators") to sue on the Government's behalf. The FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.

17. The FCA provides that any person who "'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), is liable to the United States for civil penalties "plus three (3) times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).

18. "Knowingly" is defined to mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth

or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

19. "Claim" is defined in the statute to mean "any request or demand, whether under a contract or otherwise, for money or property" which is "presented to an officer, employee, or agent of the United States." Alternatively, it is "any request or demand, whether under a contract or otherwise, for money or property" which is "made to a contractor, grantee, or other recipient" of federal funds, if the money is spent on behalf of the Government or to advance a Government program or interest, and if the Government "provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

20. "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4).

## II. THE PAYCHECK PROTECTION PROGRAM

21. On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.[1] The CARES Act was the government's initial economic response to the Covid-19 pandemic, and it included the PPP,[2] which authorized up to $349 billion in forgivable loans (known as PPP First Draw Loans) to qualifying small businesses, to facilitate job retention and certain other permitted business expenses.[3] These loans were to be made by private banks but were funded and guaranteed by SBA, which would then forgive (pay off) the loan balances if certain criteria were met.

---

[1] Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020).

[2] https://www.regulations.gov/document/SBA-2020-0015-0001.

[3] SBA Paycheck Protection Program (PPP) Loan Forgiveness: In Brief, *available at*, https://sgp.fas.org/crs/misc/R46397.pdf.

22. In April 2020, Congress authorized over $300 billion in additional PPP funding.[4] The CARES Act funding for PPP ended on August 8, 2020. By that time, there were roughly $525 billion in PPP loans made to approximately 5.2 million businesses.

23. To obtain a PPP First Draw Loan, a qualifying business had to submit a loan application signed by an authorized representative, typically to a private bank which would issue the loan with minimal underwriting, subject to an SBA guarantee and ultimately funded by the SBA.[5]

24. To qualify for a PPP First Draw Loan, a business had to certify on its application, among other things, that it (i) faced economic uncertainty due to the Covid-19 pandemic; (ii) would use the PPP First Draw Loan funds to maintain its existing payroll and to cover certain qualified expenses; and (iii) would not seek forgiveness of more than 25% of the loan for non-payroll costs.

25. PPP applicants also acknowledged that false certifications on their applications would be violations of federal law punishable by imprisonment and civil fines, including violations of: (i) 18 U.S.C. §§ 1001, 104, 3571; (ii) 15 U.S.C. § 645; and (iii) the FCA, 31 U.S.C. §§ 3729 *et seq*.

26. After receiving a PPP First Draw Loan, a qualifying business could seek forgiveness of part or all of the loan balance. Depending on the lender, a forgiveness application would be submitted either to the bank or directly to the SBA. In either event, if the application were approved, then SBA would pay off the forgiven portion of the loan balance, converting the First Draw Loan (or part thereof) into a government grant.

---

[4] *Id.*

[5] The version of the PPP First Draw Borrower Application Form (the "First Draw Loan Application") submitted by FWG is attached as Exhibit 1 to this Complaint.

27. The PPP required First Draw Loan recipients seeking forgiveness of their loan balance to certify that during an 8 or 24 week "covered period" following the disbursement of the First Draw Loan,[6] the loan proceeds:

a. were "used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures);" and

b. were used to cover "payroll costs equal to at least 60% of the forgiveness amount."[7]

28. To receive forgiveness for the PPP First Draw Loan, a recipient also had to certify: "I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges."[8]

29. On December 27, 2020, Congress enacted the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act"), which extended the SBA's authority to fund and guarantee PPP loans through March 31, 2021.[9] The

---

[6] https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness.

[7] A version of the PPP First Draw Loan Forgiveness Application Form 3508 is attached as Exhibit 2. The certifications appear on page 2.

[8] *Id.*

[9] Business Loan Program Temporary Changes – Paycheck Protection Program-Loan Forgiveness Requirements and Loan Review Procedures, as Amended by Economic Aid Act, *available at*, https://www.federalregister.gov/documents/2021/02/05/2021-02314/business-loan-program-temporary-changes-paycheck-protection-program-loan-forgiveness-requirements#:~:text=On%20December%2027%2C%202020%2C%20the,permitting%20second%20draw%20PPP%20loans.

Economic Aid Act provided an additional $284.5 billion in funds for forgivable PPP loans (known as PPP Second Draw Loans).

30. Vis-à-vis the CARES Act, the Economic Aid Act both heightened eligibility requirements for PPP loans and provided for a broader list of permitted business uses for the funds. The PPP loan program under the Economic Aid Act ended on May 31, 2021.[10]

31. To qualify for a PPP Second Draw Loan, a business had to certify, among other things, that

a. it continued to face economic uncertainty due to the pandemic;

b. it "has realized a reduction in gross receipts in excess of 25% relative to the relevant comparison time period" and, for loans over $150,000, that the borrower would provide documentation to its lender showing the reduction before seeking forgiveness for the PPP Second Draw Loan;

c. it used the PPP First Draw Loan only for eligible expenses;

d. the PPP Second Draw Loan would be used to retain and maintain payroll and to assist in paying for "mortgage interest, rent, utilities, covered operations expenditures, covered property damages costs, covered suppliers costs, and covered worker protection expenditures as specified under the [PPP] Rules"; and,

e. it would not seek forgiveness of more than 40% of the PPP Second Draw Loan would for uses other than payroll.[11]

---

[10] https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program.

[11] The version of the PPP Second Draw Borrower Application Form (the "Second Draw Loan Application") submitted by FWG is attached as Exhibit 3.

32. PPP Second Draw Loan applicants acknowledged that false certifications would be violations of federal law punishable by imprisonment and civil fines, including violations of: (i) 18 U.S.C. §§ 1001, 104, 3571; (ii) 15 U.S.C. § 645; and (iii) the FCA, 31 U.S.C. §§ 3729 *et seq.*[12]

33. After receiving a PPP Second Draw Loan, a business could seek forgiveness of part or all of the loan balance. Depending on the lender, a forgiveness application would be submitted either to the bank or directly to the SBA. In either event, if the application were approved, then the SBA would pay off the forgiven portion of the loan balance, converting the Second Draw Loan (or part thereof) into a government grant.

34. The Economic Aid Act required PPP Second Draw Loan recipients seeking forgiveness of their loan balance to certify that during an 8 or 24 week "covered period" following the disbursement of the Second Draw Loan,[13] the loan proceeds on which the recipient sought forgiveness

a. were "used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures)"; and

b. were used to cover "payroll costs equal to at least 60% of the forgiveness amount."[14]

---

[12] *Id.*

[13] https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness.

[14] A version of the PPP Second Draw Loan Forgiveness Application Form 3508 is attached as Exhibit 4. The certifications appear on page 2.

35. To receive forgiveness for the PPP Second Draw Loan, a recipient also had to certify that:

a. "the Borrower used all First Draw PPP Loan amounts on eligible expenses prior to disbursement of the Second Draw PPP Loan"; and

b. "I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges." [15]

## III. SECTION 8(a) OF THE SMALL BUSINESS ACT

36. Sections 7(j)(10) and 8(a) of the Small Business Act, 15 U.S.C. §§ 636(j)(10), 637(a)), authorize the SBA to establish a business development program for small businesses owned and controlled by socially and economically disadvantaged individuals, which is known as the 8(a) Business Development program.[16]

37. To be considered "economically disadvantaged" for purposes of eligibility to participate in the program, pursuant to 13 C.F.R. § 124.104, small business owners must certify that:

a. their net worth does not exceed $750,000 (13 C.F.R. § 124.104(c)(2));

b. their adjusted gross income averaged over the three preceding years has not exceeded $350,000 (13 C.F.R. § 124.104(c)(3)); and

c. the fair market value of their assets (including the applicant business) does not exceed $6,000,000 (13 C.F.R. § 124.104(c)(4)).

---

[15] *Id.*

[16] https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.

38. Once enrolled in the 8(a) Business Development program, continuing participants must certify their eligibility to continue in the program on an annual basis,[17] specifically by certifying each year that:

a. they continue to meet the initial application requirements discussed above (13 C.F.R. § 124.112(b)(1)); and

b. their personal financial information remains within the eligibility requirements (13 C.F.R. § 124.112(b)(3)).

39. Continuing participants in the 8(a) Business Development program must also certify annually to the truth of the company's report, submitted for each 8(a) contract performed during the year, explaining how the performance of work requirements are being met for the contract. 13 C.F.R. § 124.112(b)(18).

40. Participants in the 8(a) Business Development program enjoy significant government benefits designed "to ensure equitable access to contracting opportunities in the federal marketplace," including valuable set-asides and federal contracting preferences, as well as training and technical assistance designed to strengthen the participants' ability to compete effectively in the American economy.[18]

41. According to the Congressional Research Service, "[i]n FY2020, 8(a) firms were awarded $34.0 billion in federal contracts, including $9.3 billion in 8(a) set-aside awards and $11.1 billion in 8(a) sole-source awards."[19] A set-aside award "is a contract in

---

[17] https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.

[18] https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.

[19] Congressional Research Service, *SBA's '8(a) Program:' Overview, History, and Current Issues*, March 9, 2022, page 1, *available at* https://sgp.fas.org/crs/misc/R44844.pdf.

which only certain contractors may compete, whereas a sole-source award is a contract awarded, or proposed for award, without competition."[20]

42. Under the 8(a) Business Development program, a contract with a total value of under $4.5 million is generally granted as a sole-source award, i.e., without competition.[21] Contracts with a total value over $4.5 million are generally required to be "awarded via a set-aside, with competition limited to [8(a) Business Development program] firms, so long as there is a reasonable expectation that at least two eligible and responsible [8(a) Business Development program] firms will submit offers at a fair market price…"[22] Contracts awarded via the 8(a) Business Development program must be invoiced and certified monthly.

## STATEMENT OF FACTS

## I. FWG FRAUDULENTLY OBTAINED PPP FUNDS.

### A. The First Draw Loan/Grant

43. On April 14, 2020, FWG received a PPP First Draw Loan in the amount of $576,200. The lender for the PPP First Draw Loan was PNC Bank.

44. To obtain the PPP First Draw Loan, Defendants certified on the loan application that "current economic uncertainty makes this loan request necessary to support the ongoing operations of [FWG]." [23]

45. Defendants further certified on the loan application that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease

---

[20] *Id.*
[21] *Id.* at p. 15
[22] *Id.*
[23] A blank copy of the then-current version of the Paycheck Protection Program First Draw Borrower Application Form that FWG submitted to obtain this loan (the "First Draw Loan Application") is attached as Exhibit 1.

payments, and utility payments, as specified under the [PPP] Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."[24]

46. Defendants' certifications were material to the issuance of the First Draw Loan: had the certifications not been made, or had SBA or PNC Bank known that the certifications were false, the loan would not have been issued.

47. FWG subsequently submitted to the SBA, through PNC Bank, an application seeking to forgive the entire balance of its PPP First Draw Loan.

48. In seeking forgiveness of the First Draw Loan, Defendants certified on the forgiveness application that "the dollar amount for which forgiveness [was] requested was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures)."[25]

49. Defendants further certified on the forgiveness application that "the dollar amount for which forgiveness [was] requested include[d] payroll costs equal to at least 60% of the forgiveness amount."[26]

50. Defendants further certified on the forgiveness application that "if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges." [27]

---

[24] Exhibit 1, pg. 2.
[25] A copy of the PPP First Draw Loan Forgiveness Application is attached as Exhibit 2.
[26] Exhibit 2, pg. 2.
[27] Exhibit 2, pg. 2.

51. On August 26, 2021, SBA, relying on Defendants certifications, granted the application and forgave $565,578 of FWG's First Draw Loan, paying off PNC Bank and essentially converting the loan into a government grant.

52. Defendants' certifications were material to the forgiveness of the First Draw Loan: had the certifications not been made, or had SBA or PNC Bank known that the certifications were false, the loan would not have been forgiven.

53. Although FWG's direct counterparty in these PPP transactions was a private bank, Defendants' applications for the issuance and then the forgiveness of the First Draw Loan constitute "claims" against the United States under the FCA, insofar as they constituted a "request or demand, whether under a contract or otherwise, for money or property" which was "made to a contractor, grantee, or other recipient" of federal funds, where the money was spent on behalf of the Government or to advance a Government program or interest, and where the Government "provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A). PNC Bank was at all times acting as a grantee and agent of SBA, insofar as the initial loan was funded and guaranteed by SBA and the balance was ultimately paid off by SBA when the First Draw Loan was forgiven.

B. **<u>The Second Draw Loan/Grant</u>**

54. On January 30, 2021, FWG received a PPP Second Draw Loan, in the amount of $741,122. The lender for the Second Draw was again PNC Bank.[28]

[28] A blank copy of the then-current version of the Paycheck Protection Program Second Draw Borrower Application Form that FWG submitted to obtain this loan (the "Second Draw Loan Application") is attached as Exhibit 3.

55. To obtain the PPP Second Draw Loan, Defendants certified on the loan application that "current economic uncertainty makes this loan request necessary to support the ongoing operations of [FWG]."[29]

56. Defendants further certified on the Second Draw Loan Application that "[t]he Applicant has realized a reduction in gross receipts more than 25% relative to the relevant comparison period. For loans greater than $150,000, Applicant has provided documentation to the lender substantiating the decline in gross receipts. For loans of $150,000 or less, Applicant will provide documentation substantiating the decline in gross receipts upon or before seeking loan forgiveness for the Second Draw Paycheck Protection Program Loan or upon SBA request."[30]

57. Defendants further certified on the Second Draw Loan Application that "[t]he Applicant received a First Draw Paycheck Protection Program Loan and, before the Second Draw Paycheck Protection Program Loan is disbursed, will have used the full loan amount (including any increase) of the First Draw Paycheck Protection Program Loan only for eligible expenses."[31]

58. Defendants further certified on the Second Draw Loan Application that "[t]he funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds

[29] Exhibit 3, pg. 2.
[30] Exhibit 3, pg. 2.
[31] Exhibit 3, pg. 2.

are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."[32]

59. Defendants' certifications were material to the issuance of the Second Draw Loan: had the certifications not been made, or had SBA or PNC Bank known that the certifications were false, the loan would not have been issued.

60. Defendants subsequently submitted to the SBA, through PNC Bank, an application seeking to forgive the entire balance of its PPP Second Draw Loan.

61. In seeking forgiveness of the Second Draw Loan, Defendants certified on the forgiveness application that "the dollar amount for which forgiveness [was] requested was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures)."[33]

62. Defendants further certified on the Second Draw Loan forgiveness application that "the dollar amount for which forgiveness [was] requested include[d] payroll costs equal to at least 60% of the forgiveness amount."[34]

63. Defendants further certified on the Second Draw Loan forgiveness application that "the Borrower used all First Draw PPP Loan amounts on eligible expenses prior to disbursement of the Second Draw PPP Loan." [35]

64. Defendants further certified on the Second Draw Loan forgiveness application that that "if the funds were knowingly used for unauthorized purposes, the

[32] Exhibit 3, pg. 2.
[33] Exhibit 4, pg. 2.
[34] Exhibit 4, pg. 2.
[35] Exhibit 4, pg. 2.

federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges."[36]

65. On November 18, 2021, SBA, relying on Defendants' certifications, granted the application and forgave $747,030 of FWG's Second Draw Loan, paying off PNC Bank and essentially converting the loan into a government grant.

66. Defendants' certifications were material to the forgiveness of the Second Draw Loan: had the certifications not been made, or had SBA or PNC Bank known that the certifications were false, the loan would not have been forgiven.

67. Although FWG's direct counterparty in these PPP transactions was a private bank, Defendants' applications for the issuance and then the forgiveness of the Second Draw Loan constitute "claims" against the United States under the FCA, insofar as they constituted a "request or demand, whether under a contract or otherwise, for money or property" which was "made to a contractor, grantee, or other recipient" of federal funds, where the money was spent on behalf of the Government or to advance a Government program or interest, and where the Government "provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A). PNC Bank was at all times acting as a grantee and agent of SBA, insofar as the initial loan was funded and guaranteed by SBA and the balance was ultimately paid off by SBA when the Second Draw Loan was forgiven.

[36] Exhibit 4, pg. 2.

## C. FWG Fraudulently Obtained the PPP Funds.

68. All of Defendants' statements and certifications in connection with Defendants' applications for and receipt of the First Draw Loan and the Second Draw Loan, and with their applications for and receipt of forgiveness of those loans, as catalogued *supra* in paragraphs 44-64 and the annexed exhibits, were false. Defendants knew they were false at the time they made them.

69. Contrary to Defendants' certifications that "current economic uncertainty makes this loan request necessary to support the ongoing operations of [FWG]," FWG was faced with no economic uncertainty due to the pandemic and needed no assistance to maintain FWG's payroll at the time Defendants made the certifications.

70. As is shown below in Chart 1, notwithstanding the pandemic FWG's revenues grew 72% during the relevant time period, rising from $5,653,414 in 2019 to $9,746,518 in 2021.

71. This growth was not unexpected, as the long-term contracts that drove FWG's growth were either already established and generating revenues for FWG prior to the pandemic or were in the negotiation phase when the pandemic began. As is shown in the charts below, the majority of the government contracts that FWG had in 2020 and 2021 had been commenced in 2019 or earlier and were multiyear contracts that provided FWG with considerable economic certainty for 2020 and 2021, notwithstanding the pandemic. FWG also signed several large new government contracts during the pandemic.

**Chart 1.**

| FWG Revenue by Year | | | |
|---|---|---|---|
| **FWG Contracts** | **2019** | **2020** | **2021** |
| **DC Health Exchange** | $ 268,587.52 | $ - | $ - |
| **AFSFC DDGCRTC** | $ 51,200.00 | $ - | $ - |
| **SOCOM JICSOC IQ** | $ 364,393.50 | $ - | $ - |
| **DHHS AF C&A** | $ - | $ - | $ - |
| **BEP DAS IMPLEMENTATION** | $ 68,315.39 | $ 85,394.23 | $ - |
| **CSRA SEC ISS** | $ 934,426.23 | $ 728,581.97 | $ 440,400.00 |
| **DC ARMY NATIONAL GUARD** | $ 4,845.68 | $ 4,845.68 | $ 3,634.26 |
| **NIST DCO** | $ - | $ - | $ - |
| **SEC LMR ROLLUP** | $ 242,135.50 | $ - | $ - |
| **GFM DI** | $ - | $ 171,037.38 | $ 781,507.30 |
| **CITS III** | $ 172,401.60 | $ 172,401.60 | $ 172,401.60 |
| **DCO Enabler** | $ - | $ - | $ 2,604,583.48 |
| **HSIN IV&V** | $ - | $ - | $ 305,499.15 |
| **SOUTHCOM - Dialogo** | $ - | $ - | $ 425,844.16 |
| **SOUTHCOM - IO** | $ 990,218.00 | $ 2,376,523.20 | $ 2,376,523.20 |
| **SOUTHCOM - SIO** | $ - | $ 442,015.20 | $ 589,353.60 |
| **AFSFC TLCS Sole Source** | $ 1,618,856.68 | $ 1,753,761.40 | $ - |
| **TLCS FSR** | $ - | $ 938,103.82 | $ 2,046,771.96 |
| **NTIS OCIO/OPSIT Lifecycle Support Services** | $ 938,034.17 | $ 18,901.67 | $ - |
| **DHS SE&I** | $ - | $ - | $ - |
| **Air Force Transformation Support** | $ - | $ - | $ - |
| Total | $ 5,653,414.26 | $ 6,691,566.15 | $ 9,746,518.71 |
| YoY Change | N/A | 18% | 46% |

72. FWG's quarterly results during the baseline year of 2019 confirm that FWG faced no economic uncertainty a year later, when it certified to the contrary in applying for a First Draw Loan after the pandemic begin.

**Chart 2.**

| | FWG Revenue by Quarter 2019 | | | | |
|---|---|---|---|---|---|
| **Line** | **FWG Contracts** | **Q1** | **Q2** | **Q3** | **Q4** |
| 1 | **DC Health Exchange** | $ 73,251.14 | $ 73,251.14 | $ 73,251.14 | $ 48,834.10 |
| 2 | **AFSFC DDGCRTC** | $ - | $ 19,200.00 | $ 19,200.00 | $ 12,800.00 |
| 3 | **SOCOM JICSOC IQ** | $ 121,464.50 | $ 121,464.50 | $ 121,464.50 | $ - |
| 4 | **DHHS AF C&A** | $ - | $ - | $ - | $ - |
| 5 | **BEP DAS IMPLEMENTATION** | $ 51,236.54 | $ - | $ - | $ 17,078.85 |
| 6 | **CSRA SEC ISS** | $ 233,606.56 | $ 233,606.56 | $ 233,606.56 | $ 233,606.56 |
| 7 | **DC ARMY NATIONAL GUARD** | $ 1,211.42 | $ 1,211.42 | $ 1,211.42 | $ 1,211.42 |
| 8 | **NIST DCO** | $ - | $ - | $ - | $ - |
| 9 | **SEC LMR ROLLUP** | $ 181,601.62 | $ 60,533.87 | $ - | $ - |
| 10 | **GFM DI** | $ - | $ - | $ - | $ - |
| 11 | **CITS III** | $ 43,100.40 | $ 43,100.40 | $ 43,100.40 | $ 43,100.40 |
| 12 | **DCO Enabler** | $ - | $ - | $ - | $ - |
| 13 | **HSIN IV&V** | $ - | $ - | $ - | $ - |
| 14 | **SOUTHCOM - Dialogo** | $ - | $ - | $ - | $ - |
| 15 | **SOUTHCOM - IO** | $ - | $ - | $ 396,087.20 | $ 594,130.80 |
| 16 | **SOUTHCOM - SIO** | $ - | $ - | $ - | $ - |
| 17 | **AFSFC TLCS Sole Source** | $ - | $ - | $ 809,428.34 | $ 809,428.34 |
| 18 | **TLCS FSR** | $ - | $ - | $ - | $ - |
| 19 | **NTIS OCIO/OPSIT Lifecycle Support Services** | $ 270,069.25 | $ 270,069.25 | $ 270,069.25 | $ 127,826.42 |
| 20 | **DHS SE&I** | $ - | $ - | $ - | $ - |
| 21 | **Air Force Transformation Support** | $ - | $ - | $ - | $ - |
| | **Total** | $ 975,541.43 | $ 822,437.14 | $ 1,967,418.81 | $ 1,888,016.88 |
| | **YoY Change** | -14% | -27% | 74% | 106% |

**Chart 3.**

| | | FWG Revenue by Quarter 2020 | | | |
|---|---|---|---|---|---|
| Line | FWG Contracts | Q1 | Q2 | Q3 | Q4 |
| 1 | DC Health Exchange | $ - | $ - | $ - | $ - |
| 2 | AFSFC DDGCRTC | $ - | $ - | $ - | $ - |
| 3 | SOCOM JICSOC IQ | $ - | $ - | $ - | $ - |
| 4 | DHHS AF C&A | $ - | $ - | $ - | $ - |
| 5 | BEP DAS IMPLEMENTATION | $ 51,236.54 | $ 34,157.69 | $ - | $ - |
| 6 | CSRA SEC ISS | $ 233,606.56 | $ 233,606.56 | $ 151,268.85 | $ 110,100.00 |
| 7 | DC ARMY NATIONAL GUARD | $ 1,211.42 | $ 1,211.42 | $ 1,211.42 | $ 1,211.42 |
| 8 | NIST DCO | $ - | $ - | $ - | $ - |
| 9 | SEC LMR ROLLUP | $ - | $ - | $ - | $ - |
| 10 | GFM DI | $ - | $ - | $ - | $ 171,037.38 |
| 11 | CITS III | $ 43,100.40 | $ 43,100.40 | $ 43,100.40 | $ 43,100.40 |
| 12 | DCO Enabler | $ - | $ - | $ - | $ - |
| 13 | HSIN IV&V | $ - | $ - | $ - | $ - |
| 14 | SOUTHCOM - Dialogo | $ - | $ - | $ - | $ - |
| 15 | SOUTHCOM - IO | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 |
| 16 | SOUTHCOM - SIO | $ - | $ 147,338.40 | $ 147,338.40 | $ 147,338.40 |
| 17 | AFSFC TLCS Sole Source | $ 809,428.34 | $ 809,428.34 | $ 134,904.72 | $ - |
| 18 | TLCS FSR | $ - | $ - | $ 426,410.83 | $ 511,692.99 |
| 19 | NTIS OCIO/OPSIT Lifecycle Support Services | $ 18,901.67 | $ - | $ - | $ - |
| 20 | DHS SE&I | $ - | $ - | $ - | $ - |
| 21 | Air Force Transformation Support | $ - | $ - | $ - | $ - |
| | Total | $ 1,751,615.72 | $ 1,862,973.61 | $ 1,498,365.42 | $ 1,578,611.39 |
| | YoY Change | 80% | 127% | -24% | -16% |

73. In 2020, the first year of the pandemic, FWG's revenues grew 18% compared to the previous year, rising from $5,653,414 in 2019 to $6,691,566 in 2020. FWG's quarterly results during 2020 compared to those from the preceding year show that FWG faced no economic uncertainty when Defendants made the certifications required for a First Draw Loan. Importantly, during the first two quarters of 2020, when much of the pandemic's economic dislocation took place in the face of widespread government shutdowns, FWG experienced 80% and 127% revenue growth, respectively, compared to the corresponding quarters of 2019.

74. FWG's revenue during the last two quarters of 2020 was down a bit in comparison to the corresponding quarters of 2019, but this had nothing to do with the pandemic and everything to do with the natural life cycle and termination of government contracts. In any event, these Q3 and Q4 revenue decreases were less than the threshold of 25% required for participation in the PPP. FWG's certification in the Second Draw Loan

Application that it had suffered a decrease in revenues in at least one quarter in 2020 of 25% compared to 2019 was therefore false.

75. As mentioned above, FWG's economic performance during 2020 benefitted from the secure, long-term government contracts that were, for FWG, wholly unaffected by the pandemic. Indeed, the great majority of FWG's government contracts were in the defense industry, which saw no decrease in government spending during the pandemic.

76. FWG signed several new government contracts during 2020, after the pandemic began, including: the SOUTHCOM SIO (Chart 3, Row 16) Agreement signed on February 25, 2020; the TLCS FSR Agreement (Chart 3, Row 18) signed on July 30, 2020; and the GFM DI Agreement (Chart 3, Row 10) signed on September 25, 2020.

77. FWG's certifications with respect to the Second Draw PPP Loan were likewise false and fraudulent, because it still did not face economic uncertainty in 2021, and there were no FWG contracts that were negatively impacted by the pandemic in 2021.

78. Far from being distressed, FWG's financial performance in 2021 was robust and outstanding. As shown above in Chart 1 and below in Chart 4, FWG's revenue growth continued through 2021, with revenues growing 46% from 2020, rising from $6,691,566 to $9,746,518.

79. FWG signed several large new government contracts during 2021, including: the HSIN IV&V Agreement (Chart 4, Row 13) on March 26, 2021; and the DCO Enabler Agreement (Chart 4, Row 12) on August 21, 2021. The DCO Enabler Agreement, the preparations for which began in October 2020, is, in fact, by far the largest contract FWG has ever had and now generates a third of the company's current annual revenue. That one contract, negotiated and signed during the pandemic, has single-handedly boosted FWG's annual revenues by millions of dollars a year.

**Chart 4.**

| Line | FWG Contracts | FWG Revenue by Quarter 2021 Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|
| 1 | DC Health Exchange | $ - | $ - | $ - | $ - |
| 2 | AFSFC DDGCRTC | $ - | $ - | $ - | $ - |
| 3 | SOCOM JICSOC IQ | $ - | $ - | $ - | $ - |
| 4 | DHHS AF C&A | $ - | $ - | $ - | $ - |
| 5 | BEP DAS IMPLEMENTATION | $ - | $ - | $ - | $ - |
| 6 | CSRA SEC ISS | $ 110,100.00 | $ 110,100.00 | $ 110,100.00 | $ 110,100.00 |
| 7 | DC ARMY NATIONAL GUARD | $ 1,211.42 | $ 1,211.42 | $ 1,211.42 | $ - |
| 8 | NIST DCO | $ - | $ - | $ - | $ - |
| 9 | SEC LMR ROLLUP | $ - | $ - | $ - | $ - |
| 10 | GFM DI | $ 171,037.38 | $ 203,489.97 | $ 203,489.97 | $ 203,489.97 |
| 11 | CITS III | $ 43,100.40 | $ 43,100.40 | $ 43,100.40 | $ 43,100.40 |
| 12 | DCO Enabler | $ - | $ - | $ 651,145.87 | $ 1,953,437.61 |
| 13 | HSIN IV&V | $ - | $ 101,833.05 | $ 101,833.05 | $ 101,833.05 |
| 14 | SOUTHCOM - Dialogo | $ - | $ - | $ 106,461.04 | $ 319,383.12 |
| 15 | SOUTHCOM - IO | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 |
| 16 | SOUTHCOM - SIO | $ 147,338.40 | $ 147,338.40 | $ 147,338.40 | $ 147,338.40 |
| 17 | AFSFC TLCS Sole Source | $ - | $ - | $ - | $ - |
| 18 | TLCS FSR | $ 511,692.99 | $ 511,692.99 | $ 511,692.99 | $ 511,692.99 |
| 19 | NTIS OCIO/OPSIT Lifecycle Support Services | $ - | $ - | $ - | $ - |
| 20 | DHS SE&I | $ - | $ - | $ - | $ - |
| 21 | Air Force Transformation Support | $ - | $ - | $ - | $ - |
| | Total | $ 1,578,611.39 | $ 1,712,897.03 | $ 2,470,503.94 | $ 3,984,506.34 |
| | YoY Change | -10% | -8% | 65% | 152% |

## D. <u>FWG Misused the PPP Funds and Falsely Certified Their Use.</u>

80. In the First Draw Loan Application, Defendants certified that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments…." Likewise, in the Second Draw Loan Application, Defendants certified that "[t]he Applicant received a First Draw Paycheck Protection Program Loan and, before the Second Draw Paycheck Protection Program Loan is disbursed, will have used the full loan amount (including any increase) of the First Draw Paycheck Protection Program Loan only for eligible expenses."

81. Defendants certified in the Second Draw Loan Application that "[t]he funds [from the PPP Second Draw Loan] will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures,

covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules."

82. These certifications were false, and Defendants knew they were false at the time they made them. FWG did not use the PPP funds to retain workers or maintain payroll or to pay for other qualified expenses, because no such support was needed.

83. FWG did not need any government funding assistance to retain workers or maintain payroll during the pandemic. Because of the continuity of FWG's secure, long-term government contracts from 2019 and earlier, and the taking on of new contracts, FWG's employees continued to work without impediment during the entirety of the pandemic, and FWG did not engage in any layoffs or reductions in force stemming from the economic discombobulations of the pandemic.

84. At the onset of the pandemic, all FWG headquarters employees (most of whom were corporate management resources) successfully transitioned to remote work from home. The majority of FWG's employees who were working on specific government contracts were either already working remotely from home or were working on a government site location even before the pandemic began. Each active contract followed specific Covid-19 protocols once the pandemic began, some agencies keeping their offices open and some allowing for telework.

85. FWG employees who did begin working remotely were able to do so seamlessly, because in most cases they already had government-issued laptops that allowed them remote access to networks and information sharing systems. FWG employees who worked on contracts that continued to require them to work onsite even during the pandemic (*e.g.*, employees who worked in a SCIF or whose jobs involved other sensitive information) were unaffected by the pandemic; they simply followed the

agency's Covid-19 protocols with respect to masking, distancing, testing, etc. There were no work stoppages or suspensions as a result of the pandemic.

86. FWG did not engage in any layoffs or reductions in force in 2020 or 2021 stemming from the pandemic. Since the beginning of the pandemic, 30 employees have been separated from FWG. However, as is shown in Chart 5, below, the vast majority of these employees (26) voluntarily separated, generally to take other jobs or to retire. Two were terminated for disciplinary or performance issues, while the last two had their positions eliminated as part of corporate restructuring. None were laid off or separated due to a lack of available work during the pandemic or because government shutdowns and Covid-19 protocols made it impossible for them to continue their jobs.

**Chart 5.**

| FWG EMPLOYEES THAT LEFT EMPLOYMENT DURING PANDEMIC | | | | |
|---|---|---|---|---|
| INITIALS | Job | Term Date | Reason for Separation | Annual Salary |
| JG | USSOUTHCOM IO | 3/7/2022 | Retired; rehired in April 2022 | $104,000 |
| RL | AFSFC-TLCS | 2/28/2022 | Retired | $100,000 |
| AJ | USSOUTHCOM IO | 2/25/2022 | Resigned for personal reasons | $88,000 |
| JD | USSOUTHCOM SIO | 2/15/2022 | Resigned for personal reasons | $95,000 |
| DH | USSOUTHCOM SIO | 2/15/2022 | Resigned for personal reasons | $120,000 |
| IM | USSOUTHCOM Dialogo | 12/31/2021 | Resigned for personal reasons | $88,000 |
| MP | DCO Enabler | 12/15/2021 | Resigned for personal reasons | $90,584 |
| MF | AFSFC-TLCS | 10/15/2021 | Retired | $80,000 |
| CB | DCO Enabler | 10/8/2021 | Resigned for personal reasons | $140,000 |
| CV | AFSFC-TLCS | 9/24/2021 | Resigned for personal reasons | $61,750 |
| RK | USSOUTHCOM IO | 9/16/2021 | Resigned for personal reasons | $87,500 |
| SS | USSOUTHCOM IO | 9/15/2021 | Resigned for personal reasons | $90,000 |
| CJ | Corporate | 9/10/2021 | Resigned for personal reasons | $190,000 |
| YH | USSOUTHCOM IO | 5/10/2021 | Resigned for personal reasons | $91,000 |
| AR | USSOUTHCOM IO | 4/9/2021 | Resigned for personal reasons | $85,000 |
| DP | Corporate | 4/9/2021 | Resigned for personal reasons | $100,000 |
| NV | AFSFC-TLCS | 4/8/2021 | Resigned for personal reasons | $60,000 |
| RB | Corporate | 3/12/2021 | Resigned for personal reasons | $110,000 |
| CT | Corporate | 1/8/2021 | Separated due to corporate restructuring | $130,000 |
| XX1 | AFSFC-TLCS | 1/8/2021 | Separated from FWG due to disciplinary actions | $65,000 |
| MF | Corporate | 12/22/2020 | Separated due to elimination of his position | $190,000 |
| RR | AFSFC-TLCS | 12/18/2020 | Resigned for personal reasons | $95,000 |
| AA | USSOUTHCOM IO | 11/6/2020 | Resigned for personal reasons | $85,000 |
| NG | AFSFC-TLCS | 10/29/2020 | Resigned for personal reasons | $65,000 |
| DT | USSOCOM | 10/16/2020 | Resigned for personal reasons | $77,000 |
| XX2 | AFSFC-TLCS | 8/10/2020 | Separated from FWG due to performance issues | $60,000 |
| JM | AFSFC-TLCS | 7/14/2020 | Resigned for personal reasons | $65,000 |
| LM | AFSFC-TLCS | 7/14/2020 | Resigned for personal reasons | $60,000 |
| GS | USSOUTHCOM IO | 7/9/2020 | Resigned for personal reasons | $85,000 |
| JT | AFSFC-TLCS | 2/24/2020 | Resigned for personal reasons | $65,000 |

87. Conversely, during the same time period, FWG hired 74 new employees, as shown below in Chart 6. Twelve of these new employees have since separated and are also on Chart 5, but the great majority still work for FWG. Far from needing to *maintain* payroll, FWG's net *increase* in headcount over this period of time was 32. Thus, there was no payroll that needed to be protected from the pandemic, and no basis to seek PPP loans.

**Chart 6.**

| FWG EMPLOYEES HIRED DURING AND POST PANDEMIC | | | |
|---|---|---|---|
| Initials | Job | Hire Date | Annual Salary |
| MF | Corporate | 2/24/2020 | $190,000 |
| JM | AFSFC-TLCS | 3/10/2020 | $65,000 |
| NR | USSOUTHCOM SIO | 3/23/2020 | $87,000 |
| JD | USSOUTHCOM SIO | 3/30/2020 | $95,000 |
| MB | USSOUTHCOM SIO | 3/30/2020 | $110,000 |
| DH | USSOUTHCOM SIO | 3/30/2020 | $120,000 |
| RH | USSOUTHCOM IO | 3/30/2020 | $85,000 |
| SP | CITS III | 6/1/2020 | $80,000 |
| MB | USSOUTHCOM IO | 6/1/2020 | $105,000 |
| SM | USSOUTHCOM IO | 6/1/2020 | $75,000 |
| GS | USSOUTHCOM IO | 6/1/2020 | $85,000 |
| RR | Corporate | 6/29/2020 | $140,000 |
| AA | USSOUTHCOM IO | 7/1/2020 | $85,000 |
| SS | AFSFC-TLCS | 7/15/2020 | $85,000 |
| KK | Corporate | 8/3/2020 | $85,000 |
| CT | Corporate | 8/3/2020 | $130,000 |
| MF | AFSFC-TLCS | 8/3/2020 | $80,000 |
| NG | AFSFC-TLCS | 8/3/2020 | $65,000 |
| ER | AFSFC-TLCS | 8/26/2020 | $65,000 |
| AB | Corporate | 8/31/2020 | $108,000 |
| PL | AFSFC-TLCS | 9/14/2020 | $80,000 |
| JO | USSOUTHCOM IO | 9/14/2020 | $85,000 |
| RK | USSOUTHCOM IO | 9/14/2020 | $87,500 |
| JE | GFM-DI | 9/28/2020 | $78,000 |
| SS | USSOUTHCOM IO | 10/26/2020 | $90,000 |
| XB | GFM-DI | 11/6/2020 | $115,000 |
| AM | AFSFC-TLCS | 11/12/2020 | $65,000 |
| TM | AFSFC-TLCS | 12/28/2020 | $60,000 |
| NV | AFSFC-TLCS | 12/28/2020 | $60,000 |
| JW | USSOUTHCOM IO | 2/16/2021 | $93,000 |
| AW | AFSFC-TLCS | 4/9/2021 | $65,000 |
| ED | USSOUTHCOM Dialogo | 5/21/2021 | $65,000 |
| GC | USSOUTHCOM Dialogo | 5/21/2021 | $80,000 |
| NG | USSOUTHCOM Dialogo | 5/21/2021 | $65,000 |
| RSA | USSOUTHCOM Dialogo | 5/21/2021 | $65,000 |
| IM | USSOUTHCOM Dialogo | 5/21/2021 | $88,000 |
| SB | DHS HSIN | 6/1/2021 | $130,000 |
| FR | USSOUTHCOM IO | 6/14/2021 | $85,000 |
| AMD | AFSFC-TLCS | 7/12/2021 | $61,750 |
| CV | AFSFC-TLCS | 7/19/2021 | $61,750 |
| CJ | Corporate | 7/19/2021 | $190,000 |
| OC | DCO Enabler | 9/1/2021 | $79,887 |
| JC | DCO Enabler | 9/1/2021 | $92,000 |
| DC | DCO Enabler | 9/1/2021 | $72,000 |
| LD | DCO Enabler | 9/1/2021 | $72,838 |
| JD | DCO Enabler | 9/1/2021 | $64,986 |
| TD | DCO Enabler | 9/1/2021 | $73,008 |
| LF | DCO Enabler | 9/1/2021 | $77,116 |
| KF | DCO Enabler | 9/1/2021 | $128,000 |
| DF | DCO Enabler | 9/1/2021 | $121,085 |
| KG | DCO Enabler | 9/1/2021 | $110,000 |
| SK | DCO Enabler | 9/1/2021 | $69,040 |
| JL | DCO Enabler | 9/1/2021 | $88,496 |
| JL | DCO Enabler | 9/1/2021 | $162,000 |
| JM | DCO Enabler | 9/1/2021 | $87,924 |
| CM | DCO Enabler | 9/1/2021 | $69,040 |
| MP | DCO Enabler | 9/1/2021 | $90,584 |
| AT | DCO Enabler | 9/1/2021 | $76,300 |
| JT | DCO Enabler | 9/1/2021 | $80,724 |
| EW | DCO Enabler | 9/1/2021 | $102,169 |
| SW | DCO Enabler | 9/1/2021 | $82,004 |
| CB | DCO Enabler | 9/1/2021 | $140,000 |
| JG | USSOUTHCOM IO | 9/23/2021 | $104,000 |
| FR | AFSFC-TLCS | 9/27/2021 | $61,750 |
| JW | AFSFC-TLCS | 10/26/2021 | $61,750 |
| RH | AFSFC-TLCS | 10/26/2021 | $61,750 |
| RG | AFSFC-TLCS | 11/1/2021 | $80,000 |
| GS | Corporate | 11/1/2021 | $253,000 |
| JW | Corporate | 11/1/2021 | $225,000 |
| SL | USSOUTHCOM IO | 12/13/2021 | $90,000 |
| BS | USSOUTHCOM IO | 2/1/2022 | $94,000 |
| JC | USSOUTHCOM IO | 2/1/2022 | $80,000 |
| RR | AFSFC-TLCS | 3/1/2022 | $93,000 |
| MM | Corporate | 3/1/2022 | $150,000 |

88. Nor did FWG need any assistance "mak[ing] mortgage interest payments, lease payments, and utility payments" during this time period. In fact, FWG's lease at 1725 I Street, N.W., expired in April 2021 and was not extended or renewed due to the fact that all headquarters employees began working remotely during the pandemic. Reflecting this transition to remote work, the new headquarters office at 1101 Pennsylvania Avenue, N.W., consists of two rooms in a shared office space – a much smaller, lower-cost location than what was previously used. The Company's corporate servers are housed at Katabana's home in Potomac, Maryland.

89. Relator has seen no evidence that any of the PPP funds that FWG received were spent on eligible expenses during the pandemic. This is likely due to the fact that Katabana may have spent the funds for personal use.

90. For example, on or around February 10, 2021 – a mere eleven days after receiving the Second Draw amount of $741,122 –Katabana purchased a fancy home in Potomac, Maryland for an approximate price of $1,250,000. *See* Graphic 1.

**Graphic 1**.



91. Moreover, just a few months later, on June 15, 2021, Katabana purchased a 2017 Rolls-Royce Wraith Coupe, a sportscar whose manufacturers' suggested retail price ("MSRP") is $315,700.[37] *See* Graphic 2.

**Graphic 2**.



92. Even more recently, on February 15, 2022, Katabana purchased a second sportscar, a 2019 Ferrari 488 Spider, which values at approximately $320,000.[38] *See* Graphic 3.

**Graphic 3**.



[37] https://www.cargurus.com/Cars/2017-Rolls-Royce-Wraith-Price-c26415.
[38] https://www.carfax.com/Used-Ferrari-488_w709.

93. Moreover, at the time Katabana was certifying that FWG faced economic uncertainty and that the PPP funds would be used, among other things, to retain workers and maintain payroll, Katabana paid himself a salary of $400,000 per year. Katabana also paid his brothers, Kagarabi and Mwenemwami, a combined $148,700 to work at FWG, and his mother, Naweza, was paid $70,604 per year for an apparent no-show job.

## II. FWG AND KATABANA FRAUDULENTLY OBTAINED AND RETAINED BENEFITS UNDER THE 8(A) BUSINESS DEVELOPMENT PROGRAM.

94. On June 19, 2014, FWG entered the SBA's 8(a) Business Development program, which provides a number of government contracting benefits to small businesses owned and controlled by socially- and economically-disadvantaged individuals. FWG's 8(a) Business Development program case number is C00502.

95. FWG was originally scheduled to exit the 8(a) Business Development program on June 19, 2024. However, the program was extended by one year due to the pandemic, and FWG's new exit date is June 19, 2025.

96. To qualify for enrollment in the 8(a) Business Development program, Defendants would have been required to make the following certifications to the SBA in or before 2014:

a. Katabana's net worth did not exceed $750,000;

b. Katabana's adjusted gross income, averaged over the three preceding years, did not exceed $350,000; and

c. the fair market value of the Katabana's assets (including the value of his 100% ownership interest in FWG) did not exceed $6,000,000.

97. To remain eligible for continued participation in the 8(a) Business Development program, Defendants would have been required to make the same certifications each year in 2015, 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

98. Since at least the beginning of 2021, Defendants' certifications of eligibility for continued participation in the 8(a) Business Development program have been false, and the benefits FWG has obtained through that program have been fraudulently obtained. In brief, Katabana is not an economically-disadvantaged individual entitled to participate in the 8(a) program.

99. Defendants falsely certified that Katabana's personal net worth did not exceed $750,000 as of 2021. As discussed above, Katabana purchased a $1.25 million home in Potomac shortly after FWG received PPP Second Draw Loan funding; on information and belief, he also owns a second home in the District of Columbia (an apartment). This is in addition to two sportscars collectively worth over half a million dollars, not to mention his other personal assets, including his 100% ownership of FWG. Indeed, the significant increase in his personal net worth since the beginning of the pandemic is an expected byproduct of the significant success FWG has had growing and developing its business during that time frame.

100. Defendants also falsely certified that Katabana's adjusted gross income did not exceed $350,000. Katabana's official salary in 2021 as CEO of FWG was $400,000, but this does not include the $70,604 he paid his mother for a no-show job at the Company, which should be imputed to Katabana, making his 2021 salary $470,604, well in excess of the limit for the program. This amount does not include any dividends or profit distributions Katabana made to himself as owner of FWG, which are likely to be substantial given the significant growth in the Company's bottom line.

101. Defendants also falsely certified that the fair market value of Katabana's total personal assets (including the value of his 100% ownership interest in FWG) did not exceed $6 million as of 2021. FWG's revenues in 2021 approached $10 million, with very low overhead, and are expected to more than double in 2022; revenue from 2019 and 2020 totaled $12,344,980. This suggests a valuation for the Company (and therefore for Katabana's ownership interest) that is well in excess of the $6 million threshold. Katabana's annual imputed salary of $470,604, along with his home and automobile choices, also indicate that the fair market value of his assets is well over $6 million.

102. Defendants' annual certifications as to Katabana's net worth, income level, and asset value are all material to SBA's determination to allow FWG to continue participating in the 8(a) Business Development program: if Defendants had not made those certifications, or if SBA had known that the certifications were false, FWG would have been removed from participation in the program and no longer allowed to enjoy its benefits.

103. By falsely certifying continued eligibility for the 8(a) Business Development program, FWG fraudulently obtained and retained substantial benefits from the government – benefits to which it was not entitled, and which cost the government money to provide. This includes valuable set-aside awards and sole-source contracts, as well as training and technical assistance. A set-aside award is a contract in which only certain contractors may compete, whereas a sole-source award is a contract awarded, or proposed for award, without competition; either way, by limiting competition for government contracts to award preferences to 8(a) program participants, the government generally ends up paying more for the work than it would have on a fully open market.

104. As shown in Charts 7 and 8 below, FWG's government contract portfolio during 2020 and 2021 contained at least 11 contracts awarded under section 8(a), which FWG was either directly awarded as a sole source or for which it faced minimal competition in the bidding process. FWG's total revenue on these contracts for 2020 was $5,614,700, while in 2021 it was $8,042,247.

**Chart 7:**

| | | FWG' Section 8(a) Business Development Program Revenue by Quarter 2020 | | | | |
|---|---|---|---|---|---|---|
| Line | SBA 8(a) Status | FWG Contracts | Q1 | Q2 | Q3 | Q4 |
| 1 | 8(a) | BEP DAS IMPLEMENTATION | $ 51,237 | $ 34,158 | $ - | $ - |
| 2 | 8(a) | SOUTHCOM - IO | $ 594,131 | $ 594,131 | $ 594,131 | $ 594,131 |
| 3 | 8(a) | SOUTHCOM - SIO | $ - | $ 147,338 | $ 147,338 | $ 147,338 |
| 4 | 8(a) | AFSFC TLCS Sole Source | $ 809,428 | $ 809,428 | $ 134,905 | $ - |
| 5 | 8(a) | TLCS FSR | $ - | $ - | $ 426,411 | $ 511,693 |
| 6 | 8(a) | NTIS OCIO/OPSIT Lifecycle Support Services | $ 18,902 | $ - | $ - | $ - |
| | | Total | $ 1,473,697 | $ 1,585,055 | $ 1,302,785 | $ 1,253,162 |

**Chart 8:**

| | | FWG' Section 8(a) Business Development Program Revenue by Quarter 2021 | | | | |
|---|---|---|---|---|---|---|
| Line | SBA 8(a) Status | FWG Contracts | Q1 | Q2 | Q3 | Q4 |
| 1 | 8(a) | AFSFC DDGCRTC | $ - | $ 19,200.00 | $ 19,200.00 | $ 12,800.00 |
| 2 | 8(a) | Air Force A&A | $ - | $ - | $ - | $ - |
| 3 | 8(a) | BEP DAS IMPLEMENTATION | $ 51,236.54 | $ - | $ - | $ 17,078.85 |
| 4 | 8(a) | DCO Enabler | $ - | $ - | $ 651,145.87 | $ 1,953,437.61 |
| 5 | 8(a) | HSIN IV&V | $ - | $ 101,833.05 | $ 101,833.05 | $ 101,833.05 |
| 6 | 8(a) | SOUTHCOM - IO | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 |
| 7 | 8(a) | SOUTHCOM - SIO | $ 147,338.40 | $ 147,338.40 | $ 147,338.40 | $ 147,338.40 |
| 8 | 8(a) | TLCS FSR | $ 511,692.99 | $ 511,692.99 | $ 511,692.99 | $ 511,692.99 |
| | | Total | $ 1,304,398.73 | $ 1,374,195.24 | $ 2,025,341.11 | $ 3,338,311.70 |

105. As shown below in Chart 9, FWG's projected 2022 revenue on contracts awarded to it through the 8(a) Business Development program is $13,233,731.

**Chart 9**

| | | FWG' Section 8(a) Business Development Program Revenue by Quarter 2022 | | | | |
|---|---|---|---|---|---|---|
| Line | SBA 8(a) Status | FWG Contracts | Q1 | Q2 | Q3 | Q4 |
| 12 | 8(a) | DCO Enabler | $ 1,953,437.61 | $ 1,953,437.61 | $ 1,953,437.61 | $ 1,953,437.61 |
| 13 | 8(a) | HSIN IV&V | $ 101,833.05 | $ 101,833.05 | $ 101,833.05 | $ 101,833.05 |
| 15 | 8(a) | SOUTHCOM - IO | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 | $ 594,130.80 |
| 16 | 8(a) | SOUTHCOM - SIO | $ 147,338.40 | $ 147,338.40 | $ 147,338.40 | $ 147,338.40 |
| 18 | 8(a) | TLCS FSR | $ 511,692.99 | $ 511,692.99 | $ 511,692.99 | $ 511,692.99 |
| | | Total | $ 3,308,432.85 | $ 3,308,432.85 | $ 3,308,432.85 | $ 3,308,432.85 |

## III. <u>DEFENDANTS ACTED WITH THE REQUISITE SCIENTER.</u>

106. As discussed above, "knowing" is defined in the FCA to mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

107. Defendants had actual knowledge that their certifications in connection with the PPP funds were false and fraudulent and that FWG was not eligible to receive those funds. This actual knowledge had at least three sources.

a. First, Defendants knew the source of FWG's government contract revenue was secure and that the government contracts it had in effect or in the pipeline would not be affected by the pandemic.

b. Second, Defendants had access to FWG's actual books and records, its monthly revenue projections, and its payroll data, all of which showed that it was not experiencing economic uncertainty and did not need government support; Defendants knew, for example, which employees left the Company and why, and how many new employees FWG hired, and they knew that FWG's business model was secure in a remote-work world, as its employees for the large part were already performing well in that world.

c. Third, Defendants knew how they were actually spending the money received from PPP, and knew that these expenditures were not eligible under the program.

108. Defendants additionally and alternatively had constructive knowledge of the falsity of FWG's loan and forgiveness applications, and the certifications contained therein. At the very least, in failing to take any steps whatsoever to ensure that moneys received from the government were appropriately spent and accounted for, Defendants

acted in deliberate ignorance and reckless disregard of the truth or falsity of the information they were certifying to support their claims.

109. Defendants also had actual or constructive knowledge with respect to the false certifications made in the context of the 8(a) Business Development program. Facts such as net worth, income level, and asset value are pieces of personal information that the CEO of a multi-million dollar business would be expected to know; any misrepresentation of such information would clearly be deliberate. The fact that Katabana attempted to hide his actual income level by paying some of it to his mother for a no-show job also evidences the knowing nature of the misrepresentation.

## IV. **RELATORS' STANDING**

110. This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation or in a Government Accountability Office (GAO) or Auditor General's report, hearing, audit, or investigation, or from the news media. Nor have there been any Congressional hearings, government audits or investigations, news media accounts, or criminal, civil, or administrative hearings or lawsuits specifically addressing that issue.

111. There has been no previous disclosure or allegation by anyone in any forum concerning FWG's or Katabana's false and fraudulent certifications relating to PPP loan applications and forgiveness.

112. There has been no previous disclosure or allegation by anyone in any forum concerning FWG's or Katabana's false and fraudulent certifications relating to FWG's continued participation in the 8(a) Business Development program

113. All facts alleged herein were discovered in the first instance by the Relator, who disclosed them to the Government prior to filing this *qui tam* suit under seal and has since made no public disclosure of the facts alleged herein.

114. To the extent there has been a public disclosure unknown to Relator, Relator is an original source under 31 U.S.C. § 3730(e)(4). Relator has direct and independent knowledge of the information on which the allegations in this Complaint are based and voluntarily provided the information to the Government before filing a *qui tam* action based on the information. The allegations and causes of action set forth herein would not have come to light had it not been for Relators' knowledge, diligence, and expertise in uncovering the truth about Defendant's fraudulent schemes.

## CAUSES OF ACTION

### COUNT I

Presenting False or Fraudulent Claims –
PPP First and Second Draw Loan and Forgiveness Applications
31 U.S.C. § 3729(a)(1)(A)
(Both Defendants)

115. Relator realleges paragraphs 1 to 114 and incorporates them by reference as if fully set forth herein.

116. In applying for First and Second Draw PPP Loans in 2020 and 2021, and in applying for forgiveness of those loans in 2021, Defendants knowingly presented or caused to be presented to the United States materially false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

117. These claims included requests or demands for money or property that Defendants presented or caused to be presented to an officer, employee, or agent of the United States, as well as requests or demands for money or property made to a contractor, grantee, or other recipient of federal funds, where the money was spent on behalf of the

Government or to advance a Government program or interest, and where the Government provided or has provided a portion of the money or property requested or demanded.

118. The claims submitted were false and fraudulent, insofar as they contained material statements of fact that Defendants knew were not true, and insofar as the claims sought payment from the Government that Defendants knew they were not eligible to receive. Defendants knew that the claims were false and fraudulent at the time they submitted them and therefore acted with the requisite scienter.

119. The false and fraudulent claims submitted by Defendants were material to the Government's decision to pay: had Defendants not submitted the loan and forgiveness applications, or had the Government known of their falsity, the loans would not have been issued or forgiven.

120. By reason of Defendants' false and fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation. 31 U.S.C. § 3729(a)(1).[39]

**COUNT II**
Making or Using False Records or Statements
Material to False or Fraudulent Claims –
PPP First and Second Draw Loan and Forgiveness Applications
31 U.S.C. § 3729(a)(1)(B)
(Both Defendants)

121. Relator realleges paragraphs 1 to 114 and incorporates them by reference as if fully set forth herein.

[39] Where the Government would have paid nothing if it had known the truth, the entire amount paid by the Government as a result of a false claim is the basis for damages, before trebling and penalties. *See United States v. Rogan,* 517 F.3d 449 (7th Cir. 2008); *United States v. Alackby,* 339 F.3d 1013, 1014-15 (9th Cir. 2003); *U.S. ex rel. Emanuele v. Medicor Assocs.,* No. CV 10-245, 2017 WL 4867614, at *9 (W.D. Pa. Oct. 26, 2017) (collecting cases).

122. In connection with each and every false or fraudulent claim that is the subject of Count I, Defendants knowingly made, used, or caused to be made or used, one or more false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B).

123. Specifically, in connection with each of FWG's applications for First and Second Draw PPP Loans in 2020 and 2021, and its applications for forgiveness of those loans in 2021, Defendants certified to the truth of one or more statements relating to FWG's eligibility for and intended use of the PPP funds, as detailed above. These certifications were false or fraudulent, and Defendants knew they were false and fraudulent at the time they submitted them.

124. The false and fraudulent statements, and any records submitted with them, were material to the Government's decision to pay: had Defendants not made the certifications, or had the Government known of their falsity, the loans would not have been issued or forgiven.

125. By reason of Defendants' false and fraudulent records and statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation. 31 U.S.C. § 3729(a)(1).

**COUNT III**
Presenting False or Fraudulent Claims –
Section 8(a) Business Development Program
31 U.S.C. § 3729(a)(1)(A)
(Both Defendants)

126. Relator realleges paragraphs 1 to 114 and incorporates them by reference as if fully set forth herein.

127. In connection with FWG's continued participation in SBA's Business Development program under sections 7(j)(10) and 8(a) of the Small Business Act, 15 U.S.C. §§ 636(j)(10), 637(a)), in 2021 and afterwards, Defendants knowingly presented or caused to be presented to the United States materially false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

128. Specifically, and as detailed above, Defendants knowingly presented or caused to be presented to the United States claims for benefits under the 8(a) Business Development program, including but not limited to bids for set-aside contract awards, bids for sole source contract awards, invoices for monthly payments under those contracts, and training and technical assistance.

129. These claims included requests or demands for money or property that Defendants presented or caused to be presented to an officer, employee, or agent of the United States, as well as requests or demands for money or property made to a contractor, grantee, or other recipient of federal funds, where the money was spent on behalf of the Government or to advance a Government program or interest, and where the Government provided or has provided a portion of the money or property requested or demanded.

130. The claims submitted were false and fraudulent, insofar as they contained material statements of fact that Defendants knew were not true, and insofar as the claims sought payment from the Government that Defendants knew they were not eligible to receive. Defendants knew that the claims were false and fraudulent at the time they submitted them (and knew that FWG was not eligible for continued participation in the 8(a) Business Development program or its benefits), and they therefore acted with the requisite scienter.

131. The false and fraudulent claims submitted by Defendants were material to the Government's decision to pay: had the Government known that Defendants were not eligible to continue participating in the 8(a) Business Development program, the set-aside and sole source contracts in question would not have been awarded to FWG.

132. By reason of Defendants false and fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation. 31 U.S.C. § 3729(a)(1).

## COUNT IV
Making or Using False Records or Statements
Material to False or Fraudulent Claims --
Section 8(a) Business Development Program
31 U.S.C. § 3729(a)(1)(B)
(Both Defendants)

133. Relator realleges paragraphs 1 to 114 and incorporates them by reference as if fully set forth herein.

134. In connection with each and every false or fraudulent claim that is the subject of Count III, Defendants knowingly made, used, or caused to be made or used, one or more false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B).

135. Specifically, in connection with each claim for benefits under the 8(a) Business Development program since at least 2021, including but not limited to bids for set-aside contract awards, bids for sole source contract awards, invoices for monthly payments under those contracts, requests for training and technical assistance, and annual certifications of eligibility to continue participating, Defendants certified to the truth of one or more statements relating to FWG's eligibility for continued participation in the 8(a) Business Development program, as detailed above. These certifications were

false or fraudulent, and Defendants knew they were false and fraudulent at the time they submitted them.

136. The false and fraudulent statements, and any records submitted with them, were material to the Government's decision to pay: had Defendants not made the certifications, or had the Government known of their falsity, the SBA would have removed FWG from the 8(a) Business Development program, and the set-aside and sole source contracts in question would not have been awarded to FWG.

137. By reason of Defendants' false and fraudulent records and statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation. 31 U.S.C. § 3729(a)(1).

## COUNT V
Unjust Enrichment
(Both Defendants)

138. Relator realleges paragraphs 1 to 114 and incorporates them by reference as if fully set forth herein.

139. By receiving and retaining over a million dollars in PPP funds – loans which were forgiven and converted to grants – to which they had no entitlement as a matter of law under the CARES Act and the Economic Aid Act (and implementing regulations), Defendants have been unjustly enriched.

140. By receiving and retaining tens of millions of dollars in government benefits – including but not limited to set-aside contract awards, sole source contract awards, monthly payments under those contracts, and training and technical assistance – to which they had no entitlement as a matter of law under the Small Business Act, Defendants have been unjustly enriched.

141. As a matter of conscience and equity, Defendants should not be allowed to retain funds belonging to U.S. taxpayers to which they are not entitled as a matter of law and by which they are unjustly enriched, and they must be made to disgorge such funds.

**WHEREFORE**, Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

1. On Counts One through Four (FCA), in favor of the United States in an amount equal to three times the damages sustained by the United States on account of Defendant's actions, plus civil penalties in the maximum amount allowed by law;
2. On Count Five (Unjust Enrichment), in favor of the United States in an amount necessary to disgorge from Defendants and restore to the Government the total amount by which Defendants were unjustly enriched;
3. On all counts, in favor of the Relator in the maximum amount allowable under the FCA for the relator's share of the Government's recovery;
4. On all counts, in favor of the Relator for his reasonable attorneys' fees and costs incurred in bringing the case; and
5. For all other and further relief as may be allowed by law and as the Court may deem just and proper under the circumstances.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial as to all matters so triable.

Dated: New York, New York
July 6, 2022

DiCELLO LEVITT GUTZLER LLC
*Counsel for Relator Jeffrey W. White*

By: ______________________________

F. Franklin Amanat
D.C. Bar No. 433779
D.D.C. Bar ID NY0482
Greg G. Gutzler (*pro hac vice* to come)
Charles F. Dender (*pro hac vice* to come)
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, New York 10165
(646) 933-1000
famanat@dicellolevitt.com
ggutzler@dicellolevitt.com
cdender@dicellolevitt.com